**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

**PERRY LAFRANCE,**
Plaintiff,

v.                                   *Case No.:* _____

**BOARD OF TRUSTEES OF THE WEST**
**PALM BEACH POLICE PENSION FUND,**
in its official capacity; and
**Jonathan Frost, Sean Williams, Dana Fragakis,**
in their individual and official capacities,

Defendants.

---

**COMPLAINT FOR VIOLATION OF CIVIL RIGHTS**
**(42 U.S.C. § 1983)**
**JURY TRIAL DEMANDED**

---

**PRELIMINARY STATEMENT**

1.  This is a civil rights action brought under 42 U.S.C. § 1983 by Perry LaFrance, a Black, retired West Palm Beach police officer who contracted COVID-19 in the line of duty in 2021, suffered permanent respiratory disability as a consequence, and was denied line-of-duty disability classification by the Board of Trustees of the West Palm Beach Police Pension Fund (the "Board"), while the Board simultaneously approved line-of-duty classification for white officers in materially identical or weaker circumstances.

2.  Officer Babcock, a white officer with pre-existing conditions who became disabled following a duty-related event, received line-of-duty approval in 2021 under the Board's own "able before / disabled after" standard, a standard Plaintiff satisfies on identical elements. Officers Testa and Williams, white officers who died following COVID-19 workplace exposure, had survivor benefits approved in 2022 as line-of-duty deaths. Plaintiff, a Black officer who contracted COVID-19 on duty and sustained permanent respiratory disability confirmed by three physicians, including the Board's own independent medical examiner, was denied. The comparisons are documented in the Board's own official records.

3.  The Board deviated from its own standard practice of publishing only generalized medical summaries in officer pension minutes: it published specific diagnoses in Plaintiff's case alone, the only Black officer in the comparator set, and included a false tuberculosis characterization directly contradicted by the ICD-10 code R76.11, which expressly states

"WITHOUT ACTIVE TUBERCULOSIS." The Board subsequently redacted that characterization and conformed Plaintiff's record to the format used for every white comparator officer.

4. When Plaintiff sought administrative redress, the Board offered to waive all fees in exchange for a full release of his discrimination claims, then closed his Administrative Correction Petition without a hearing or written determination.

5. Plaintiff seeks declaratory relief, injunctive relief compelling proper classification, compensatory damages, and such other relief as the Court deems just.

## PARTIES

6. Plaintiff Perry LaFrance is an individual residing in Broward County, Florida. He is a Black, retired police officer who served with the West Palm Beach Police Department from January 5, 2015 through September 30, 2022. He contracted COVID-19 in the line of duty on December 25, 2020 and sustained permanent respiratory disability as a result. He is actively seeking employment in structured indoor work environments requiring regular interaction with others, making the accuracy of public records bearing on his background and medical history particularly important to his ability to obtain employment.

7. Defendant Board of Trustees of the West Palm Beach Police Pension Fund (the "Board") is a governmental entity established under Florida Statutes Chapter 185, responsible for administering the West Palm Beach Police Pension Fund and determining disability benefit classifications for covered officers. The Board acts under color of state law. As the entity vested with sole and exclusive authority under Florida Statutes §§ 185.05 and 185.06 to administer the Fund, interpret plan provisions, and adjudicate benefit classification determinations, the Board is the final policymaking authority for purposes of municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). The Board acts through majority vote of its members, and each benefit classification determination made by majority vote of the Board constitutes official policy attributable to the Board as an entity.

8. Defendants include Chairman Jonathan Frost, who presided over Plaintiff's disability hearing, summarized the denial rationale on the record including reference to the "tuberculosis issue," and authorized or ratified closure of Plaintiff's Administrative Correction Petition; Board Member Sean Williams, who stated on the record that the medication cited in the noncompliance rationale was "for something other than COVID"; and Board Member Dana Fragakis, who participated in the hearing and vote on Plaintiff's application. All individual defendants are sued in both their individual and official capacities.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3)–(4) (civil rights), and 42 U.S.C. § 1983.

10. This Court has supplemental jurisdiction over any state law claims pursuant to 28 U.S.C. § 1367.

11. Venue is proper in the Southern District of Florida pursuant to 28 U.S.C. § 1391(b)(1) and (2) because Defendants reside and conduct official business within this District, and a substantial part of the events giving rise to the claims occurred within Palm Beach County, Florida.

## FACTUAL ALLEGATIONS

### A. Plaintiff's Service, COVID-19 Exposure, and Resulting Disability

12. Perry LaFrance was employed as a police officer with the West Palm Beach Police Department from January 5, 2015 through September 30, 2022. Pre-existing conditions of asthma and scoliosis were documented but non-limiting: Plaintiff passed all required entry and annual physicals, completed all in-service training and fitness requirements, and worked full duty with no restrictions throughout his career.

13. On December 25, 2020, during the course of his official duties, Plaintiff contracted COVID-19. His employment duties brought him into regular contact with members of the public and detainees, including individuals later confirmed to have been COVID-19 positive.

14. Following his COVID-19 infection, Plaintiff required supplemental oxygen for several months. Pulmonary function testing showed permanent structural impairment. His lung function never returned to pre-COVID baseline. He was unable to return to full-duty work as a police officer and was separated from service due to his disabling condition. The Board's own Final Order finds Plaintiff "totally and permanently disabled."

15. Three physicians, including the Board's own independent medical examiner, confirmed that Plaintiff was able to perform full police duties before COVID-19 and was permanently and totally disabled afterward, the same functional findings the Board's articulated rule treats as sufficient for line-of-duty classification, as reflected in the Babcock determination.

**B. The Board's "Able Before / Disabled After" Standard: Officer Babcock as Primary Comparator**

16.  The Board unanimously approved Officer Gregory Babcock, a white officer, for line-of-duty disability classification in 2021 under a rule the Board articulated in its own minutes and Final Order: an officer with pre-existing conditions qualifies for line-of-duty disability classification if the officer was able to perform the full duties of a police officer before the precipitating duty-related event and is permanently unable to perform those duties afterward. Board Member Marchese stated during deliberations: "With that being disclosed he can attest to his abilities before and after the injury." (Babcock Minutes, October 8, 2021, p. 2.) Officer Babcock had pre-existing conditions, was able to perform full duties before the duty-related event, became permanently unable to perform those duties afterward, and was approved unanimously.

17.  Plaintiff had pre-existing conditions, was able to perform full duties before the duty-related event, and became permanently unable to perform those duties afterward. Each of the Board's stated rule elements is satisfied in both cases. The outcomes differ: Officer Babcock was approved; Plaintiff was denied. The Board's deliberative record in the Babcock proceeding contains no inquiry into medication compliance, competing causation theories, or attribution of disability to pre-existing conditions; those criteria first appear in the Board's handling of Plaintiff's case.

18.  The Board's Final Order in Babcock states: "A pre-existing condition was disclosed by the applicant but was noted he was of able body to complete the duties of a police officer prior to the injury cited." Under this standard, pre-existing conditions are not a bar to line-of-duty classification: if the officer was functioning at full duty before the duty event, that pre-existing condition does not defeat the claim. This standard, as articulated by the Board itself, defines what it means for two officers to be similarly situated for purposes of line-of-duty disability classification.

19.  Plaintiff satisfies each material element of the Board's rule. The following comparison is drawn from the Board's own official records:

*Table 1: Babcock vs. LaFrance — Rule-Application Comparison (Board Record)*

| Element | Babcock (White) | LaFrance (Black) |
|---|---|---|
| Pre-existing conditions | Yes | Yes |
| Able to perform full duties before the duty-related event | Yes | Yes |
| Duty-related event | Yes | Yes |

| Permanently unable to perform duties afterward | Yes (approved) | Yes (Board Final Order: "totally and permanently disabled") |
|---|---|---|
| Officer's Race | White | Black |
| Classification | Line-of-duty | Not line-of-duty |

20. Under the Board's stated rule and its material criteria, both cases satisfy the same elements yet resulted in opposite outcomes. Officer Babcock was a white officer with pre-existing conditions who was able to perform full duties before his duty-related event and permanently unable afterward, and was approved. Plaintiff is a Black officer with pre-existing conditions who was able to perform full duties before his duty-related event and permanently unable afterward, and was denied. The Board's stated rationales for denial, including tuberculosis-related concerns and noncompliance, were not raised, examined, or applied in the Babcock proceeding and were not applied to Officer Babcock under the same rule. Each of these determinations was made by the same Board of Trustees acting under the same statutory authority and decision-making framework.

### Corroborating Evidence of Discriminatory Intent

21. The Board's primary stated basis for denial, noncompliance, consisted of two components: a latent tuberculosis reference and an asthma inhaler issue. Following Plaintiff's Administrative Correction Petition, the Board directed redaction of the tuberculosis characterization from its own administrative record and conformed Plaintiff's minutes to the general-reference format the Board had applied to all other officers from the outset. The inhaler cited does not treat the condition causing Plaintiff's disability, and Board Member Williams acknowledged on the record that it was "for something other than COVID." (Hearing Transcript, p. 91.)

### C. Independent COVID Comparator Basis: Officers Testa and Williams (2022)

22. In 2022, the Board reviewed the COVID-19 death cases of Officers Testa and Williams, both white. In each case, the Board recognized COVID-19 as a duty-related exposure and unanimously granted full line-of-duty survivor benefits to each officer's family. (Testa Minutes, April 8, 2022, pp. 1–2; Williams Minutes, May 13, 2022, pp. 1–3.) The Board applied no pre-existing condition scrutiny, no medication compliance inquiry, and no competing causation challenge in either proceeding. Plaintiff contracted COVID-19 during active duty and received a confirmed diagnosis within 45 days of his last day of active service, satisfying the same temporal criterion applied by the Board in the Testa and Williams determinations.

23. The following comparison is drawn from the Board's own official records:

*Table 2: COVID Comparator Cases — Board Record Comparison*

| Element | Testa (White) | Williams (White) | LaFrance (Black) |
|---|---|---|---|
| COVID-19 exposure in line of duty | Yes | Yes | Yes |
| Able-bodied before exposure | Yes | Yes | Yes |
| Permanent impairment / death | Death | Death | Permanent disability |
| Medical proof of duty-related cause | Yes | Yes | Yes (unrebutted — three physicians) |
| Pre-existing condition scrutiny applied | No | No | Yes |
| Compliance inquiry applied | No | No | Yes |
| Classification | Line-of-duty | Line-of-duty | Not line-of-duty |

24. Two white officers with COVID-19 duty exposures resulting in death were approved for line-of-duty classification. One Black officer with a COVID-19 duty exposure resulting in permanent disability, confirmed by three physicians including the Board's own independent medical examiner, all unrebutted, was denied. Plaintiff faced pre-existing condition scrutiny, medication compliance inquiry, and competing causation challenges that neither Testa nor Williams faced. In its response to the circuit court's Order to Show Cause in the certiorari proceeding, the Board asserted that the federal statute cited by Plaintiff, the Safeguarding America's First Responders Act of 2020, "has no effect on a state or local pension plan." The Board evaluated the Testa and Williams COVID-19 claims based on duty-related COVID-19 exposure and diagnosis within 45 days of active service, the same factual criteria Plaintiff satisfied.

25. At the conclusion of the June 14, 2024 hearing, Chairman Frost summarized the Board's denial rationale as follows: "Claimant recovered following diagnosis of COVID-19. Claimant's disability is a result of scoliosis, a preexisting back condition, and a report of preexisting asthma. This does not even get into the tuberculosis issue." Chairman Frost further stated: "My first note was really the noncompliance issue. That came up early and I think it was a concern to all of us." (Hearing Transcript, pp. 170–171.) Board Member Williams acknowledged at the hearing that the inhaler at issue was "for something other than COVID." (Hearing Transcript, p. 91.)

**D. The Board's Selective Publication of Medical Diagnoses and the False Tuberculosis Characterization**

26. The Board's consistent practice in its public meeting minutes, as reflected across multiple officer determinations in its own official minutes, is to record a general reference to

the medical presentation, such as "detailed report presented" or "summary presented", without listing individual diagnoses.

27. The Board materially deviated from that practice in Plaintiff's case alone. In Plaintiff's public Board minutes, the Board listed specific diagnoses by name, including asthma, scoliosis, and a characterization of "latent TB." The comparative publication pattern is set forth below:

*Table 3: Comparative Publication of Medical Information in Board Minutes*

| Officer | Race | Publication Practice in Board Minutes | Individual Diagnoses Published |
|---|---|---|---|
| Babcock | White | General reference only | No |
| Martin | White | "Detailed report presented" | No |
| Simonian | White | "Detailed report presented" | No |
| Raja | Indian | "Summary presented" | No |
| LaFrance | Black | Individual diagnoses listed by name in permanent public minutes | **Yes — including false communicable disease characterization ("latent TB")** |

28. The sole deviation from the Board's standard publication practice is in the record of the only Black officer in the comparator set. This departure is independently probative of discriminatory purpose under Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266–68 (1977).

29. The "latent TB" characterization is false. A June 3, 2024 memorandum correctly described a "non-specific reaction to a TB skin test"; the same memorandum later recast this as a "prior positive tuberculosis test"; and Board counsel then asserted at the formal hearing that Plaintiff was "untreating his latent TB." Chairman Frost referenced the "tuberculosis issue" in summarizing the Board's denial rationale. The underlying ICD-10 code is R76.11, defined as a nonspecific reaction to a tuberculin skin test without active tuberculosis. It does not indicate tuberculosis in any form.

30. The false "latent TB" characterization was published in Plaintiff's permanent public Board minutes dated December 9, 2024, contemporaneously with the denial. The characterization is searchable online, appears in background checks, and has been interpreted by employers as a serious communicable disease, blocking Plaintiff's employment opportunities. Plaintiff was not provided notice or an opportunity to contest the publication prior to its inclusion. No such publication of specific diagnoses occurred in the records of comparator officers. Plaintiff is actively seeking employment in structured indoor work environments requiring regular interaction with others; the inclusion of a false communicable disease characterization in a permanent government record directly harms his ability to obtain employment and causes ongoing economic harm.

### E. The Post-Petition Redaction

31.  On December 5, 2025, Plaintiff filed his Administrative Correction Petition challenging the "latent TB" publication. Following that filing, the Board directed the redaction of the tuberculosis characterization from Plaintiff's public Board minutes. As revised, Plaintiff's minutes present his medical information in a general-reference format consistent with the format used for white comparator officers Babcock, Martin, and Simonian, the format the Board applied to all other officers from the outset.

32.  The Board chose not to apply that format to Plaintiff's record until Plaintiff formally challenged the disparity. The Board did not notify Plaintiff that the redaction had occurred, did not issue a written correction acknowledging the inaccuracy, and did not issue any public statement confirming Plaintiff does not have tuberculosis.

33.  The false "latent TB" characterization existed in publicly accessible Board minutes from the time of its publication through the date of redaction. Any person reviewing Plaintiff's pension record during that period would have encountered the false communicable disease label. The redaction did not restore Plaintiff's reputation in the eyes of any person who reviewed the original minutes prior to redaction.

34.  The sequence, diagnoses published for the Black officer and no other officer in the comparator set; a false communicable disease label placed in the Black officer's record; label removed only after a formal discrimination petition, supports a plausible inference that the original publication was purposeful.

### F. The Settlement Offer

35.  On January 12, 2026, following the Board's January 9, 2026 meeting, Board counsel communicated to Plaintiff that the Board would "waive fees with a full release" while maintaining its position as a prevailing party entitled to attorney's fees. The proposed release required Plaintiff to relinquish all claims arising from the Board's denial and related proceedings as a condition of the fee waiver.

36.  Plaintiff did not accept the settlement offer and continued to pursue his administrative and legal remedies.

### G. The Administrative Correction Petition

37. On December 5, 2025, Plaintiff filed an Administrative Correction Petition requesting that the Board apply its established "able before / disabled after" standard, apply the statutory presumption under §185.34, reclassify his disability as line-of-duty, and correct the false tuberculosis statement in the Board's public minutes. On January 12, 2026, Board counsel confirmed that the Board had reviewed the Petition but "took no action." The Board did not hold a hearing and did not issue a written determination addressing the Petition.

38. On January 13, 2026, Plaintiff filed a Motion for Reconsideration and Administrative Correction requesting that the Board reconsider its prior action following correction of the administrative record, apply the same governing standard uniformly, and issue a written determination. On February 26, 2026, the Plan Administrator responded that "all due process has been exhausted" and that the Board considered the matter closed, without adjudicating the Motion on the merits and without issuing a written determination.

39. Florida Statutes §§ 185.05, 185.06, and 185.341(3) impose affirmative procedural obligations on the Board, including the obligation to render written final orders on benefit classification determinations. The Board's closure of Plaintiff's petition without hearing or written order deprived Plaintiff of those procedural protections.

**H. Bankruptcy Disclosure**

40. Plaintiff is presently a Chapter 7 debtor in the United States Bankruptcy Court for the Southern District of Florida, Case No. 26-10176-SMG. An adversary proceeding is pending at Case No. 26-01075-SMG. Prior to the filing of this Complaint, Plaintiff disclosed this § 1983 civil rights claim to Trustee Slott as required by 11 U.S.C. § 541 and applicable disclosure obligations. Plaintiff reserves all rights and interests in this claim consistent with applicable bankruptcy law.

**I. Comparator Evidence: Joshua Martin Bankruptcy**

41. Joshua Martin is a former West Palm Beach police officer and a participant in the West Palm Beach Police Pension Fund, subject to the same Board of Trustees that governs Plaintiff's pension benefits. Officer Martin is white.

42. Joshua Martin filed for bankruptcy protection. At the August 8, 2025 meeting of the full Board of Trustees, Board counsel reported: "Mr. Martin has filed for bankruptcy. Matter will be monitored accordingly. No further action is warranted at this juncture." (West Palm Beach Police Pension Fund Board Minutes, August 8, 2025, p. 1.) The Board took no enforcement action in response to Officer Martin's bankruptcy filing.

43.  At the September 12, 2025 meeting of the full Board of Trustees, Board counsel reported: "An Order of Discharge was issued in the Bankruptcy of Joshua Martin by Erik P. Kimball, Chief United States Bankruptcy Judge on August 08, 2025. The Board can take no action to recover the overpayment made by the custodian." (West Palm Beach Police Pension Fund Board Minutes, September 12, 2025, p. 1.) The Board accepted the discharge. No adversary proceeding was filed, no non-dischargeability action was pursued, and no fee recovery was sought from Officer Martin.

44.  The Board's response to Officer Martin's bankruptcy, as reflected in its own official minutes, is evidence that the Board accepted bankruptcy discharge without adversary enforcement against at least one similarly situated pension plan participant.

45.  Plaintiff is a Black former West Palm Beach police officer and a participant in the same West Palm Beach Police Pension Fund, subject to the same Board of Trustees. When Plaintiff filed Chapter 7 bankruptcy, Case No. 26-10176-SMG, the Board did not respond as it did in Martin's case. Instead, the Board initiated Adversary Proceeding No. 26-01075-SMG seeking to have attorney fees declared nondischargeable and continued enforcement efforts through the bankruptcy court.

46.  The differential enforcement response to the two officers' bankruptcy filings is reflected in the Board's own official records. Both officers were former West Palm Beach police officers, participants in the same pension plan, subject to the same Board of Trustees, and filed bankruptcy protection. The Board accepted Martin's discharge without adversary litigation but pursued nondischargeability litigation against Plaintiff. The comparison is set forth in Table 4 below.

*Table 4: Bankruptcy Comparator — Martin vs. LaFrance*

| Element | Joshua Martin (White) | Perry LaFrance (Black) |
|---|---|---|
| Former WPB police officer | Yes | Yes |
| Participant in same pension plan | Yes | Yes |
| Subject to same Board of Trustees | Yes | Yes |
| Filed bankruptcy | Yes | Yes |
| Board response at filing | "No further action is warranted at this juncture" (Board Minutes, Aug. 8, 2025) | Board initiated adversary proceeding |
| Discharge treatment | Board accepted discharge; no recovery sought | Board sought nondischargeability of attorney fees |
| Adversary proceeding filed | No | Yes — No. 26-01075-SMG |
| Civil-rights claims pending against Board at time of filing | No | Yes |

## CAUSES OF ACTION

### COUNT I — VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT
*(42 U.S.C. § 1983 — Racial Discrimination in Denial of Line-of-Duty Classification)*

47. Plaintiff repeats and realleges paragraphs 1 through 46 as if fully set forth herein.

48. The Equal Protection Clause of the Fourteenth Amendment prohibits state actors from intentionally discriminating against persons on the basis of race. At all relevant times, the Board acted under color of state law in adjudicating line-of-duty disability and death benefit classifications.

49. Plaintiff, a Black officer, was denied line-of-duty disability classification despite satisfying each material element of the Board's own stated rule, "able before / disabled after", confirmed by three physicians including the Board's own independent medical examiner. White comparator officers were approved under materially identical or weaker circumstances:

> (a) **Officer Babcock (white, primary comparator):** approved for line-of-duty disability in 2021. Babcock had pre-existing conditions, was able to perform full duties before his duty-related event, and was permanently unable afterward, the identical factual predicate Plaintiff presents under the Board's own stated rule. Under that rule's material criteria, both cases satisfy the same elements. The outcomes are opposite. (See Table 1, supra.)
>
> (b) **Officers Testa and Williams (white, independent COVID comparator):** approved for line-of-duty survivor benefits in 2022 following COVID-19 workplace exposure. In each case, the Board expressly applied the Safeguarding America's First Responders Act of 2020, finding that the officer met the Act's criteria, including duty-related exposure and diagnosis within 45 days of active service. In Plaintiff's case, the Board asserted that the Act "has no effect on a state or local pension plan" and declined to apply it, while imposing additional scrutiny not applied in the Testa and Williams proceedings. (See Table 2, supra.)

50. The Board's differential enforcement conduct in Plaintiff's and Officer Martin's bankruptcy proceedings provides additional documentary evidence of discriminatory enforcement. As shown in Table 4, both men were former West Palm Beach police officers, participants in the same pension plan, subject to the same Board of Trustees, and filed bankruptcy protection. The Board accepted Martin's discharge without filing an adversary proceeding; it initiated Adversary Proceeding No. 26-01075-SMG against Plaintiff seeking

nondischargeability of attorney fees. Under Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 266–68 (1977), disparate treatment of similarly situated individuals supports an inference of discriminatory purpose.

51. The Board's publication practice provides separate documentary evidence of discriminatory intent under Arlington Heights, 429 U.S. at 266–68. The Board deviated from its standard practice of general-reference medical summaries exclusively in Plaintiff's case, the only Black officer in the comparator set, by publishing individual diagnoses including a false communicable disease characterization. (See Table 3, supra.) The Board's subsequent redaction and conforming of Plaintiff's record to the format used for white officers confirms that the original deviation was anomalous.

52. The false "latent TB" characterization is contradicted on its face by ICD-10 code R76.11 ("WITHOUT ACTIVE TUBERCULOSIS") and is evidence of a pretextual medical narrative. Chairman Frost's reference to the "tuberculosis issue" in summarizing the denial rationale confirms it influenced the outcome. Each stated rationale is also inconsistent with the Board's own record: the finding that Plaintiff "recovered from COVID" is contradicted by the Board's own Final Order finding him "totally and permanently disabled" (Hearing Tr. p. 141); the scoliosis rationale is medically irrelevant, Plaintiff served more than seven years at full duty with scoliosis, and his disability is pulmonary; pre-existing asthma does not defeat line-of-duty classification under the Board's own Babcock standard.

53. The Board's record reflects that the inhaler cited in the noncompliance rationale does not treat the condition causing Plaintiff's disability, and Board Member Williams acknowledged on the record that the medication was "for something other than COVID." (Hearing Transcript, p. 91.) The Board's own articulated decision rule contains no compliance condition; introducing noncompliance as a disqualifying factor in Plaintiff's case, absent from the standard as applied to Babcock, is itself a departure from the Board's own stated rule. Further, the Board's stated rationales for denial, including noncompliance and tuberculosis-related concerns, are contradicted by the Board's own record and were not part of the deliberative record in the Babcock proceeding; absent those rationales, the Board's own findings establish an officer with pre-existing conditions who was able to perform full duties before the duty-related event and was found totally and permanently disabled afterward.

54. As a direct and proximate result of the Board's equal protection violation, Plaintiff has suffered: loss of line-of-duty disability classification and associated benefits; loss of pension benefit differential; reputational damage from false medical characterizations affecting his ability to obtain employment; emotional distress; and financial damages in an amount to be proven at trial.

## COUNT II — VIOLATION OF PROCEDURAL DUE PROCESS UNDER THE FOURTEENTH AMENDMENT

*(42 U.S.C. § 1983 — Failure to Provide Adequate Process; Stigmatizing Publication Without Prior Notice or Opportunity to Be Heard)*

55. Plaintiff repeats and realleges paragraphs 1 through 46 as if fully set forth herein.

56. Plaintiff has a constitutionally protected property interest in his pension disability classification and benefits. Florida Statutes Chapter 185 creates a legitimate claim of entitlement to line-of-duty disability classification for officers who meet the statutory criteria. The Board's consistent application of this standard in prior determinations establishes a legitimate claim of entitlement where its criteria are satisfied.

57. Plaintiff has a constitutionally protected liberty interest in his reputation. The Board's publication of "latent TB" in Plaintiff's publicly accessible Board minutes attributed a contagious communicable disease to a retired law enforcement officer. ICD-10 code R76.11 expressly records the absence of tuberculosis. The stigmatizing publication occurred in conjunction with the concurrent denial of Plaintiff's classification benefits, satisfying both elements of the stigma-plus doctrine under Board of Regents v. Roth, 408 U.S. 564 (1972), Paul v. Davis, 424 U.S. 693 (1976), and Cannon v. City of West Palm Beach, 250 F.3d 1299 (11th Cir. 2001).

58. The false "latent TB" characterization was applied selectively to Plaintiff alone, not as part of a uniform practice. (See Table 3, supra.) The selectivity of the false stigmatizing publication, directed at the only Black officer in the comparator set, negates any innocent administrative explanation for the liberty interest deprivation.

59. The Board deprived Plaintiff of adequate process by:

(a) Issuing a written Final Order that failed to apply the Board's established decision-making criteria in a consistent and non-discriminatory manner and relied on internally inconsistent and unsupported rationales;

(b) Closing Plaintiff's Administrative Correction Petition without conducting a hearing and without issuing a written determination on the merits;

(c) Publishing a false communicable disease characterization in Plaintiff's public Board minutes without affording Plaintiff notice or an opportunity to contest prior to inclusion; and

(d) Failing to apply the procedural requirements of Florida Statutes §§ 185.05, 185.06, and 185.341(3) in a uniform and non-discriminatory manner in adjudicating Plaintiff's benefit classification.

60. The Board's procedural failures foreclosed Plaintiff's access to any meaningful administrative remedy by refusing to adjudicate his post-decision filings, declining to

conduct a hearing, and failing to issue any written determination on the merits, thereby rendering further administrative review unavailable.

61.  As a direct and proximate result of the Board's procedural due process violations, Plaintiff has suffered loss of benefits, loss of meaningful review rights, reputational harm, professional economic harm, and emotional distress in an amount to be proven at trial.

## COUNT III — FIRST AMENDMENT RETALIATION
*(42 U.S.C. § 1983 — Conditioning Relief on Release of Civil Rights Claims / Retaliation for Petition Activity)*

62.  Plaintiff repeats and realleges paragraphs 1 through 46 as if fully set forth herein.

63.  The First Amendment, incorporated against the states by the Fourteenth Amendment, protects the right to petition the government for redress of grievances. The right to file and pursue civil rights claims is a protected form of petitioning activity.

64.  On January 12, 2026, following the Board's January 9, 2026 meeting, Board counsel communicated to Plaintiff that the Board would "waive fees with a full release" while maintaining its position as a prevailing party entitled to attorney's fees. The proposed release required Plaintiff to relinquish all claims arising from the Board's denial and related proceedings as a condition of the fee waiver. The Board did not offer unconditional relief or relief unconnected to the abandonment of civil rights claims. Conditioning government benefit relief on the abandonment of constitutional civil rights claims constitutes adverse action sufficient to deter a person of ordinary firmness from continuing to exercise First Amendment-protected rights.

65.  The Board's closure of Plaintiff's Administrative Correction Petition without a hearing or written determination, following Plaintiff's refusal to accept a settlement conditioned on a full release of claims, constitutes adverse action. Plaintiff thereafter engaged in further protected activity by filing a discrimination complaint with the City of West Palm Beach on January 14, 2026. On January 17, 2026, the City's Human Resources Director advised Plaintiff that the City Attorney would "personally be handling" the matter.

66.  At the February 20, 2026 Board meeting, Board counsel reported that Plaintiff had filed complaints with the City and that counsel had been in communication with the City Attorney and had provided the City with records regarding Plaintiff's matter. At that same meeting, the Board voted 4-0 to authorize enforcement action to recover attorney's fees. The Board's enforcement vote occurred at the same meeting at which it was informed of Plaintiff's protected activity.

67. Adversary Proceeding No. 26-01075-SMG was filed on March 4, 2026. The Board's initiation of the adversary proceeding seeking to declare attorney's fees nondischargeable constitutes a further adverse action. The adversary proceeding was initiated after Plaintiff had filed his Administrative Correction Petition raising discrimination claims, declined the Board's conditional settlement offer, and pursued additional protected activity through complaints to City officials. When Officer Martin, a white officer and participant in the same plan, filed bankruptcy, the Board took no enforcement action and accepted discharge without adversary proceedings. The Board's decision to initiate adversary litigation against Plaintiff, following his protected activity and in contrast to its treatment of Martin, supports an inference of retaliatory purpose.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Perry LaFrance respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally, and award the following relief:

(a) **Declaratory Relief:** A declaration that Defendants violated Plaintiff's rights under the Equal Protection Clause of the Fourteenth Amendment by treating Plaintiff differently from similarly situated white officers in the adjudication of his disability classification;

(b) **Declaratory Relief:** A declaration that Defendants' selective publication of Plaintiff's medical information, including an inaccurate communicable disease characterization, and deviation from the general-reference format applied to other officers constitutes intentional discrimination in violation of the Equal Protection Clause;

(c) **Declaratory Relief:** A declaration that Defendants violated Plaintiff's procedural due process rights by failing to provide adequate process in adjudicating his disability classification and Administrative Correction Petition, and by publishing stigmatizing and inaccurate medical information without prior notice or opportunity to contest;

(d) **Declaratory Relief:** A declaration that Defendants' conditioning of fee waiver on Plaintiff's release of claims, closure of Plaintiff's Administrative Correction Petition following Plaintiff's refusal to accept that condition, and subsequent actions taken in response to Plaintiff's continued pursuit of his claims constituted First Amendment retaliation;

(e) **Injunctive Relief:** An injunction ordering the Board to reconsider Plaintiff's application for line-of-duty disability classification under the same decision-making criteria applied to Officer Babcock and in the Testa and Williams proceedings, including the "able before / disabled after" standard and the duty-exposure basis relied upon in those cases, without the additional scrutiny applied in Plaintiff's case, and consistent with the standards the Board applied in

those comparator proceedings, including its application of the Safeguarding America's First Responders Act of 2020;

(f) **Injunctive Relief:** An injunction ordering the Board to conduct a hearing and issue a written determination on Plaintiff's Administrative Correction Petition and Motion for Reconsideration;

(g) **Injunctive Relief:** An injunction ordering correction of Plaintiff's public Board minutes to remove the inaccurate tuberculosis-related characterization, conform Plaintiff's record to the general-reference format applied to other officers, and issue a written public correction acknowledging that the prior characterization did not reflect Plaintiff's medical record;

(h) **Compensatory Damages:** Compensatory damages for lost benefits, the differential between non-duty and line-of-duty disability classification, reputational harm, economic harm affecting Plaintiff's ability to obtain employment, emotional distress, financial burden associated with defending Adversary Proceeding No. 26-01075-SMG, and all other damages proven at trial;

(i) **Punitive Damages:** Punitive damages against individual Defendants in their individual capacities for conduct motivated by racial animus or undertaken with reckless or callous indifference to Plaintiff's federally protected rights;

(j) **Attorney's Fees and Costs:** Attorney's fees and costs pursuant to 42 U.S.C. § 1988 and any other applicable provision of law;

(k) **Such Other Relief:** Such other and further relief as this Court deems just and proper.


## DEMAND FOR JURY TRIAL


Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury on all issues so triable.


## STATUTE OF LIMITATIONS


This action is timely filed. The Board's Final Order denying line-of-duty classification was issued on February 14, 2025, within the applicable four-year limitations period under Florida Statutes § 95.11(3), which governs § 1983 claims arising in Florida. See Baker v. Gulf & Western Industries, Inc., 850 F.2d 1480 (11th Cir. 1988). The false tuberculosis characterization was published in or about December 2024 and the retaliatory settlement offer was made on January 9, 2026, both well within the limitations period. The adversary proceeding was initiated in 2026. Accrual did not run while Plaintiff diligently pursued available administrative remedies.

Respectfully submitted,

Perry LaFrance
Pro Se
3570 N.W. 34th Way
Lauderdale Lakes, FL 33309
perrylfrnc@gmail.com
305-565-0543
Date: 3/25/2026